A.M. ALFARO ET AL. *v.* STAUFFER CHEMICAL CO., A
CORPORATION.

[No. 3-1274A210. Filed May 12, 1977. Rehearing denied June 21, 1977.
Transfer denied September 6, 1977.]

*William H. Albright, Cox & Albright Professional Corporation,* of South Bend, *David R. Holmes,* of Plymouth, for appellants.

*Robert W. Mysliwiec, Frederick H. Link,* of South Bend, for appellee.

HOFFMAN, J.—Each of the 33 plaintiffs-appellants were formerly salaried employees of appellee Stauffer Chemical Company. The appellants ceased employment with Stauffer Chemical at the close of business on August 31, 1971. On such date, the plant and associated business was transferred as a going concern to United Foam, Inc. The appellants contend they are entitled to severance pay under Bulletin No. 8-40 of Stauffer's Standard Practice Instructions (S.P.I. 8-40). Trial to

the court resulted in a judgment adverse to the employees. Thereafter, appellants' motion to correct errors was overruled and this appeal was perfected. The issues presented on appeal are whether the findings of the trial court are clearly erroneous and whether the decision is contrary to law.[1]

Appellants suffered a negative judgment in a bench trial in which the trial court made specific findings of fact and conclusions of law. Accordingly, our standard of review is governed by Indiana Rules of Trial Procedure, Trial Rule 52 (A), which provides, in pertinent part, as follows:

> "On appeal of claims tried by the court without a jury or with an advisory jury, at law or in equity, the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."

In elaboration of the "clearly erroneous" standard, the Civil Code Study Commission Comments states that,

> "[A] finding upon an issue against a party with the burden of proof will be reversed only if the evidence is uncontradicted and will support no reasonable inference in favor of the finding."
>
> 3 Harvey, Ind. Pract.—Rules of Civ. Proc., *Civil Code Study Commission Comments*—Rule 52 (a), at 423 (1970).

The Comments further state that this follows the federal rule where a case will be reversed as clearly erroneous

---

1. Appellants also contended that the findings of fact, conclusions of law and decision of the trial court were 1) contrary to the evidence, 2) not supported by sufficient evidence, and 3) against the weight of the evidence. However, in view of the fact that appellants suffered a negative judgment, an attack against the sufficiency of the evidence to support such a judgment raises no issue for review. *Dyer Constr., Inc.* v. *Ellas Constr., Inc.* (1972), 153 Ind. App. 304, 287 N.E.2d 262. A negative decision may only be attacked as contrary to law. *Dyer Constr., Inc.* v. *Ellas Constr., Inc., supra.*

Appellants further contended that the findings, conclusions and decision of the trial court erroneously decided new questions of law, citing Indiana Rules of Procedure, Appellate Rule 11 (B) (2) (b). This rule applies to petitions for transfer to the Supreme Court and is thus inapplicable at the present stage of the appellate process.

"[W]hen, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

Appellants contend that the following findings of fact by the trial court are clearly erroneous:

"8. No written contract of employment was entered into between any of the plaintiffs and Stauffer.

"9. For some years prior to August 31, 1971, Stauffer had in effect a severance pay policy which it had established for a specific intended purpose as a voluntary gratuitous policy, the application of which was to be determined in each individual instance in accordance with the unilateral decision of the company. This policy was embodied in S.P.I. 8-40, being a statement of Stauffer's policy and practice with respect to severance pay. The abbreviation of 'S.P.I.' means 'Standard Practice Instructions' which consist of voluminous instructions covering all areas of the company's affairs, viz. engineering, finance, insurance, etc. S.P.I. 8-40 was a part of the employee relations section which, in turn, was a part of the whole.

"10. The Standard Practice Instructions were furnished to the management of Stauffer as a guide in the administration of the company's affairs. They were for the sole use of those employees of Stauffer who were charged with the responsibility of carrying out the company's instructions and policies and were not intended for publication to persons other than those directly involved in their use. When a member of management applied the terms of an S.P.I. governing a specific subject such as finance, employee relations, engineering, etc., he would call on those management employees whose responsibilities were in such specific areas to confirm that he was applying the S.P.I. correctly.

"11. The existence of S.P.I. 8-40 relating to severance pay was maintained on a confidential basis. It was not Stauffer's policy to discuss severance pay with prospective employees nor to publish or disseminate notice of its existence.

"12. Plaintiffs did not rely on S.P.I. 8-40 in particular or the existence of severance pay generally in accepting or continuing employment with Stauffer.

"13. S.P.I. 8-40 specifically reserved to Stauffer the right to interpret, apply, amend or revoke the severance pay policy and the evidence established that, historically, Stauffer exercised this reservation of right and applied

the policy consistently and in accord with its intent in establishing the policy. Employees terminated without a continuity of employment, as in the case of plant shut-downs and individual termination of various causes, were granted severance pay to alleviate their period of unemployment. However, severance pay was never granted in the cases of the sales of Stauffer operations sold as a going concern where the purchaser undertook to continue the employment of the Stauffer personnel involved. Certain of the plaintiffs were not only award (sic) of the absence of severance pay in the sale of a going business, but were themselves involved in similar sales where severance pay was not paid by Stauffer or its corporate predecessors."

The facts disclose that the severance pay policy was contained in a manual which was distributed to managerial personnel only and was not disseminated to employees generally. In its brief in support of its motion to correct errors, appellants admit that the thirteen plaintiffs who did not testify at trial had no knowledge of the severance pay policy. Andrew Varab testified that he had no knowledge concerning the existence of a severance pay policy prior to the sale of the division to United Foam. Those appellants who had read S.P.I. 8-40 were managerial personnel who had possession of the manual because of their position. They acknowledged however that the Standard Practice Instructions were not distributed to employees generally. Moreover, appellant George Gustafson, manager of plant personnel at Bremen, Indiana, from November, 1969, until its sale as an ongoing concern, testified that none of the prospective employees he interviewed requested information concerning severance pay nor had he volunteered such information to them. Likewise, appellant James J. Ferraro, personnel assistant, never volunteered information to prospective employees concerning severance pay. However, in response to the inquiries of the two or three people who asked, Ferraro acknowledged the existence of a policy and further qualified his answer by stating that its application depended upon the conditions under which the employee was terminated. John M. Strantz, Midwest Area Manager for Employee Relations, stated he never dis-

cussed severance pay with interviewees at the Bremen plant, and that he never distributed literature to any prospective employee containing any reference to severance pay. Finally, Robert Wearne testified that in a 1963 meeting in the company offices in North Chicago severance pay was discussed only in response to questioning. The personnel specialist at that meeting stated that Stauffer had a severance policy "typical of the chemical industry."

Fred Duker, Corporate Manager of Employee Benefits, testified that it was not Stauffer's policy to grant severance pay when the employee has other employment immediately upon termination.

In its application of the policy, Stauffer granted severance pay in instances where there were plant shut downs and no continuation of employment. However, where there was a sale of a plant as a going concern with no break in the continuity of employment, severance pay was deemed inapplicable. Moreover, John P. Grasso testified that in two instances of termination of individual employees of which he was aware, neither employee had prospects for immediate employment.

The evidence is not without conflict and supports reasonable inferences in favor of the findings of the trial court. Thus the findings that severance pay was not part of the contractual relationship between the parties but was a voluntary gratuitous benefit, that its application was to be determined solely by the unilateral decision of Stauffer, and that its existence was not published or disseminated to the employees are not clearly erroneous.

Appellants further asserted that the trial court's finding that appellants did not rely on severance pay as a benefit of employment is clearly erroneous because reliance is presumed from a continuance of work after learning of the benefit. None of appellants testified that they continued

work in reliance on the benefit. However, appellants' attack is focused upon a presumption. Appellants however do not contend that the presumption is a conclusive one. Thus the trial court could give it such weight as it deemed appropriate. Additionally, it should be noted that it operates only after finding an offer existed and after the employee learns of the benefit. This finding is not clearly erroneous.

Appellants next contend that the judgment of the trial court is contrary to law. When considering such a contention on appeal, it must be borne in mind that it is only where the evidence leads to but one conclusion and the trial court has reached a contrary conclusion that such decision will be disturbed as contrary to law. Stated differently, the test is whether it affirmatively appears that reasonable men could not have arrived at the same conclusion as did the trial court. *Dyer Constr., Inc.* v. *Ellas Constr., Inc.* (1972), 153 Ind. App. 304, 287 N.E.2d 262.

Appellants contend that the trial court's decision is contrary to law in that the severance pay policy embodied in S.P.I. 8-40 constituted an offer of a unilateral contract which was accepted by the employees continued employment after learning of the benefit. In support of the proposition that the severance pay policy was part of the contractual relationship between the parties, appellants rely on *Hinkeldey* v. *Cities Service Oil Company* (1971), Mo., 470 S.W.2d 494; *Anthony* v. *Jersey Central Power & Light Co.* (1958), 51 N.J. Super. 139, 143 A.2d 672; *Hercules Powder Co.* v. *Brookfield* (1949), 189 Va. 531, 53 S.E.2d 804; Annot., 40 A.L.R.2d 1044 (1955).[2]

In *Hinkeldey* v. *Cities Service Oil Company, supra,* seven former employees of Cities Service Oil Company brought an

2. The Annotation located at 40 A.L.R.2d 1044, is confined to contracts for severance pay. It does recognize however that,
"Dismissal compensation may be classified according to whether it is (1) legislatively, or in a similar manner compulsorily, required, (2) purely voluntary or gratuitous, or (3) contractual." (Footnote omitted.) *Id.*, § 1, at 1045.

action for breach of a contract to grant them severance pay upon the sale of the business to Gulf Oil Company. Cities Service had adopted a severance pay plan, the benefits of which were to be available to employees terminated by a decision of the company and for whom no direct replacement would be necessary. Although the document containing the severance pay policy "was not intended to be distributed generally to all employees and was not so distributed, it was not marked secret or confidential and department heads were not advised that it was secret and confidential." (At 497 of 470 S.W.2d.) However, the contents of the policy were to be orally disseminated to the employees. This was one of the customary methods used by Cities Service in disseminating information to employees of the division.

Each plaintiff knew about the severance pay plan. When the proposed sale to Gulf was announced, plaintiffs, apprehensive about their future employment situation confirmed the existence of the plan. Relying thereon, knowing that if they resigned they would lose their severance pay, and thinking that if they remained they would receive severance pay upon termination of their employment, the employees remained on the job rather than quit to search for other employment. Thereafter "it was announced that those being terminated and not being offered employment by Gulf would receive severance pay but that those whose employments were being terminated but who were offered employment by Gulf would not receive severance pay." (At 498 of 470 S.W.2d) On this basis the plaintiff were denied severance pay.

In response to the company's assertion that the written plan did not constitute an offer, the court, at 501 of 470 S.W.2d, stated:

"The intention on the part of Cities Service to make an offer is evidenced by the direction of the Kansas City manager to department heads that the information with respect to ER-1 Revised be disseminated by staff employees to the rank and file of the employees of the division. It

was not necessary to constitute an offer that Cities Service assemble the employees in a meeting and hand them written copies of ER-1 Revised. There was sufficient evidence of actual communication of the offer to the employees for the jury to make a finding that the offer was communicated. A method customarily used by Cities Service in disseminating information to employees of the Kansas City division was employed to communicate the offer. Acceptance of the offer is to be found in the fact that with knowledge of ER-1 Revised these plaintiffs continued in the service of their employer until their employment was terminated. Croskey v. Kroger Co., Mo. App., 259 S.W.2d 408, 412."

Generally, an offeree cannot accept an offer unless its terms have been communicated to him by the offeror. *Restatement, Contracts,* § 23, at 28 (1932) ; 1 Williston on Contracts, 3d Ed., § 33, at 92 (1957) ; 17 Am. Jur. 2d, *Contracts,* § 31, at 368. *See also, Molumby* v. *Shapleigh Hardware Company* (1965), Mo. App., 395 S.W.2d 221.

Thus in *Hinkeldey* the trier of fact found that there was a communication of the offer by the company to the employees. Likewise, in *Hercules Powder Co.* v. *Brookfield, supra,* (1949), 189 Va. 531, 53 S.E.2d 804, the defendant company published in its weekly newspaper that its proposed dismissal wage plan had been approved by the government and put into effect by defendant, and, two weeks later, circulated a revised edition of its "Employees Handbook" which contained a brief outline of the policy. In *Anthony* v. *Jersey Central Power & Light Co., supra* (1958), 51 N.J. Super. 139, 143 A.2d 762, the company issued its "General Rules" which were compiled and distributed by the company to all its employees. In each instance, the employer followed a course of conduct to communicate the plan to its employees.

In the case at bar, the trial court found that the existence of S.P.I. 8-40 was maintained on a confidential basis and that Stauffer did not discuss severance pay with prospective employees nor publish notice of its existence. This being

the case, there was no communication of the offer to appellants. And, there can be no acceptance of an offer the existence of which is unknown. I Williston on Contracts, § 33, at 92, *supra*. Nor can there by any reliance on such an offer.

Appellants cite *Orton and Steinbrenner Co.* v. *Miltonberger* (1920), 74 Ind. App. 462, 129 N.E. 47, for the proposition that imperfect knowledge by an employee of a benefit policy does not preclude recovery thereon. *Orton* was an instance in which the employer posted a notice in the factory stating that it would pay a bonus to its employees and further stating the applicable terms and conditions. Thereafter, plaintiff was offered employment with the company and was informed that the company would pay a bonus in addition to his wages. Plaintiff, however, did not know that the above mentioned notice was posted nor the terms and conditions thereof. Appellant's only knowledge was the general knowledge acquired from the company's agents. At 468 of 74 Ind. App., at 49 of 129 N.E., the court stated:

> "That the element of bonus was an inducement to appellee to accept employment with appellant is corroborated by the well-known fact, a fact which appears by the evidence, that the wages for any kind of labor at the time of appellee's employment were much higher than $2 per day. It is true that appellant's superintendent, at the time of the employment, did not go into the details of the method to be used in determining the amount of the bonus, but the assurance by the superintendent of a bonus to be paid induced an acceptance of employment, and further assurance by the night foreman to the same effect induced a continuance in service. When the superintendent promised a bonus, he must be understood to have meant a bonus in such amount as the method adopted by appellant for its computation would produce, and appellee, by entering the service and performing the labor for which he was employed, accepted such terms."

It should be noted that the employer affirmatively acted in an attempt to disseminate notice of the bonus policy throughout the plant. Moreover, when the plaintiff was hired after the policy was adopted and published generally to the em-

ployees, he received assurances that a bonus would be paid. This is consistent with the company's intent generally to communicate the policy to its employees.

Thus, the case stands for the proposition that an offeree knowing that an offer has been made to him but not knowing its terms can accept whatever terms it contains. Restatement, *Contracts,* § 23, at 28 (1932), Comment a.

Appellants remaining contentions presuppose the existence of an enforceable contract. However, since there was no offer which was capable of acceptance, and therefore, no contract, these contentions need not be further considered.

The judgment of the trial court must therefore be affirmed.

Judgment affirmed.

Staton, P.J. and Garrard, J., concur.

NOTE.—Reported at 362 N.E.2d 500.